CITY OF EVANSVILLE, Indiana, Green Construction of Indiana, Inc., Grex Realty Corporation, Inc., Corley Concrete Corporation, Old National Bank in Evansville, as Trustees under a Trust Indenture dated October 1, 1973, Robert E. Green, Defendants-Appellants,

v.

VERPLANK CONCRETE & SUPPLY, INC., Plaintiff-Appellee.

No. 1–479A107.

Court of Appeals of Indiana, First District.

Feb. 19, 1980.

Rehearing Denied March 18, 1980.

Curtis V. Kimmell and L. Edward Cummings, Kimmell, Funk & Cummings, Vincennes, Robert T. Bodkin, Bamberger, Foreman, Oswald & Hahn, Evansville, for defendants-appellants.

Richard H. Adin, Robert S. Matthews, Matthews & Shaw, Evansville, for plaintiff-appellee.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendants-appellants City of Evansville, Green Construction Corporation of Indiana, Inc., Grex Realty Corporation, Inc., Corley Concrete Corporation, Old National Bank in Evansville, and Robert E. Green, appeal the judgment of the Vanderburgh Superior Court ordering the foreclosure of a mechanic's lien held by plaintiff-appellee Verplank Concrete & Supply, Inc., upon certain property known as the Executive Inn Parking Garage.

## FACTS

In August, 1972, Robert E. Green (Green), a director and officer of both Green Construction of Indiana, Inc. (Green Construction) and Grex Realty Corporation, Inc. (Grex Realty), purchased certain real estate located within the city limits of Evansville. He conveyed the property to Green Construction on October 27, 1972.

In January, 1973, Green Construction undertook the construction of a parking garage on the property. Green Construction entered into a contract with Corley Concrete Corporation (Corley) providing that Corley would supply preformed and prestressed concrete beams, "T's", and the like, according to the architect's specifications. These component structures were prefabricated at Corley's plant in Lafayette and shipped to Evansville. Green Construction, as owner/contractor, was responsible for the erection of the structure.

From January 31, until October 11, 1973, Verplank Concrete & Supply, Inc. (Verplank) supplied Corley with various mixtures or grades of cement for use in precasting the segments. At some point in time, Corley ran into financial difficulty as a result of which Verplank did not receive payment for approximately $49,500 worth of cement delivered to the Lafayette factory.

On July 30, 1973, Green Construction conveyed the aforementioned property along with other adjacent parcels to Grex Realty. Grex Realty then conveyed the property to the City of Evansville (the City) on October 31.[1]

On November 6, 1973, Verplank filed notice of intent to hold a mechanic's lien upon the property known as the Executive Inn Parking Garage. Verplank filed suit to foreclose the lien in September, 1974; a judgment in Verplank's favor is the basis of the appeal.

## ISSUES

Appellants present two issues for review:[2]

1) Whether the trial court erred in allowing the filing of a mechanic's lien upon public property.
2) Whether the trial court erred in allowing the materialman of a materialman a mechanic's lien upon the property.

We reverse.

*Issue One*

Mechanic's liens are governed by statutory law, Ind.Code 32–8–3–1 *et seq.* Ind.Code 32–8–3–1 (Supp.1979) provides, in part:

"(That) contractors, subcontractors, mechanics, lessors . . ., journey-

---

1. The agreement between Grex Realty and the City will be explained in detail later in the opinion.

2. Appellants have raised other issues in their brief which we do not reach due to our determination on the issues listed.

men, laborers and all other persons performing labor or furnishing materials or machinery, . . . for the erection, altering, repairing or removing any . . building, . . . may have a lien separately or jointly upon the . . . building, . . . which they may have erected, altered, repaired, moved or removed or for which they may have furnished materials or machinery of any description, and, on the interest of the owner of the lot or parcel of land on which it stands or with which it is connected to the extent of the value of any labor done, material furnished, or either . . . ."

In *Moore-Mansfield Construction Company v. Indianapolis, Newcastle and Toledo Railway Company* (1913) 179 Ind. 356, 372, 101 N.E. 296, our Supreme Court described the purpose of mechanic's liens as follows:

"The mechanics' lien laws of America, in general, reveal the underlying motive of justice and equity in dedicating, primarily, buildings and the land on which they are erected, to the payment of the labor and materials incorporated, and which have given to them an increased value. The purpose is to promote justice and honesty, and to prevent the inequity of an owner enjoying the fruits of the labor and materials furnished by others, without recompense. . . . "

It has long been the law that mechanic's liens may not be acquired or enforced upon public property. *Fatout v. Board of School Commissioners of City of Indianapolis* (1885) 102 Ind. 223, 1 N.E. 389; *Board of Commissioners of Parke County v. O'Conner* (1882) 86 Ind. 531; *Repp and Mundt, Inc. v. Hitzelberger Supply Co., Inc.* (1976) Ind.App., 353 N.E.2d 547. Appellants contend that Verplank's lien, notice of which was filed on November 6, 1973, failed to attach for the reason that the property was owned by the City at that time.

Although it is uncontested that the City holds fee simple title to the property as a result of the conveyance from Grex Realty, whether the parking garage is the type of *public property* or *property held for a public use* traditionally afforded immunity from mechanic's liens remains a contested issue.

On March 23, 1973, while the real property was owned by Green Construction, Grex Realty submitted a report to the Evansville Economic Development Commission (the Commission) on the economic impact of the proposed project. On March 26, the Commission, established under and acting pursuant to authority granted by Ind.Code 18–6–4.5–1 *et seq.*, passed a preliminary resolution concerning the proposed project. On October 1, the Common Council of the City passed an ordinance authorizing the construction, acquisition, and leasing of the garage as an economic development facility, the issuance of revenue bonds to finance the construction thereof, and the safeguarding of the interests of holders of said bonds by lease and trust indenture.

The lease was signed by Grex Realty and the City on October 1; the trust indenture, entered into by the City, Grex Realty, and the Old National Bank of Evansville (the Bank), was executed and dated the same day. The trust indenture was signed on October 31; the property was conveyed to the City by warranty deed the same day "for the sum of one dollar and other good and valuable consideration." The City issued tax-exempt Economic Development First Mortgage Revenue Bonds, Grex Realty Corporation, Inc.,[3] in the aggregate amount of $1,500,000. To secure the bonds, the City "borrowed" that sum from the Bank and executed a trust indenture which was, according to its terms, a mortgage, a deed of trust, and a security interest. The City transferred all rights and interests in the real estate, buildings and improvements, lease, etc., to the trustee, the Bank.

The lease, effective October 1, 1973, through October 1, 1989, or until all bonds are redeemed, provides that the lessor will

---

**3.** The heading on the bonds reads as follows:
"CITY OF EVANSVILLE
ECONOMIC DEVELOPMENT FIRST MORTGAGE
REVENUE BOND
GREX REALTY CORPORATION, INC."

construct or complete and equip the building, with the lessee's approval, paying the costs of same with disbursements from the general construction fund, and will reimburse the lessee for all costs incurred in purchasing and improving the property. According to the terms of the indenture, interest and principal on the bonds are to be paid with funds generated by the operation of the facility and tendered as rent in accordance with the schedule of redemption. The lessee has the option to purchase the facility at any time after the lessee tenders to the trustee the amount of money necessary to redeem all bonds and cover the trustee's fees and expenses. The purchase price is ten dollars.

The appellants correctly note that in Ind.Code 18–6–4.5–1 (Supp.1979), the legislature expressly declares that the financing of economic development facilities and pollution control facilities for use by others is a *public purpose*. They contend that, the instant facility having been financed in accordance with the statutory provisions set forth in Ind.Code 18–6–4.5–1 *et seq.*, it unquestionably attains the status of public property used for a public purpose. While we agree with the assertion that the garage has been deemed an economic development facility, the *financing* of which is a public purpose, we are not convinced that the facility is the type of property which should be afforded protection from the attachment of mechanic's liens.

As mentioned above, mechanic's liens have not been permitted to attach to public property held for public use. Such property has traditionally included the following: schools, *Fatout, supra*; *United States Fidelity & Guaranty Company v. American Radiator Company* (1908) 41 Ind.App. 712, 84 N.E. 558; *United States Fidelity & Guaranty Company v. American Blower Company* (1908) 41 Ind.App. 620, 84 N.E. 555; courthouses, *Board of Commissioners of Parke County, supra*; bridges, *Board of Commissioners of Pike County v. Norrington* (1882) 82 Ind. 190; state university housing, *Repp & Mundt, Inc., supra.* Judge Lybrook stated in *Repp & Mundt, Inc., supra*, at page 548 of 353 N.E.2d, "[P]ublic policy and public necessity alike forbid the acquisition or enforcement of such a lien." It requires very little imagination to realize how disruptive the attachment and attempted foreclosure of such liens might be to the orderly operation of state and local government.

The legislature has, however, provided for the protection of such interests in Ind. Code 5–16–5–1 *et seq.* Ind.Code 5–16–5–1 states, in part:

"when any public building or other public work or public improvement of any character whatsoever is being constructed, erected, altered or repaired under contract at the expense of the state or at the expense of any county, city, town, township, school corporation, assessment district, or any other political subdivision or commission created by law, it shall be the duty of any such board, commission, trustee, officer or agent acting on behalf of the state, county, city, town, township, school corporation, assessment district, or other political subdivision or commission created by law, *to withhold final payment to the contractor until such contractor has paid to the subcontractor or subcontractors, materialmen for material furnished*, labor employed in such construction or those furnishing any service in relation to or in connection with such construction, erection, alteration or repair, *all bills due and owing the same . . . .*" (Emphasis added.)

Ind.Code 5–16–5–2 states, in part:

"*a good and sufficient bond shall be executed by the contractor to the state of Indiana*, and approved by and for the benefit of any such board, commission, trustee, officer or agent acting on behalf of the state, county, city, town, township, school corporation, assessment district, or other political subdivision or commission created by law in an amount equal to the total *contract price, . . .* such bond by its terms also shall be conditioned *as to directly inure to the benefit of subcontractors, laborers, materialmen, and those performing service as herein provided . . . .*" (Emphasis added.)

Ind.Code 5–16–5.5–1 *et seq.* provides additional, related protection.

According to the statutory language, the above protections are available only to those parties who are involved in the construction, alteration, or repair of a public building, work or improvement, undertaken *at the expense* of the municipality. Ind. Code 5–16–5–1 further states, in part:

"The terms 'public building,' 'public work' and 'public improvement,' or combinations thereof, as used in this act, shall be construed to include all buildings, work or improvements *the cost of which is paid for by funds derived from taxation or from special assessments* imposed and levied on the real estate, land and lots benefited thereby."

The public works which are embraced by these terms are substantially those listed hereinabove as the types which are immune from the attachment of mechanic's liens, i. e., schools, courthouses, bridges, highways, etc. They are quite distinct from the economic development facilities defined in Ind. Code 18–6–4.5–2 (Supp.1979). Furthermore, Ind.Code 18–6–4.5–12 expressly provides, in part:

"The governing body of a municipality *may levy a special tax* to pay the costs of operation of its development commission, *but such funds shall not be used to pay any of the costs attributable to the acquisition and leasing or sale of facilities except for advancements to be reimbursed from bond proceeds.*" (Emphasis added.)

We are of the opinion that this is a crucial point of distinction. The legislature enacted Ind.Code 18–6–4.5–1 *et seq.* to remedy conditions of insufficient employment opportunities, insufficient diversification of industry, and insufficient abatement or control of pollution. The statute has as its goal the encouragement of economic development; the financing of such facilities is undoubtedly a legitimate public purpose. However, it is important to note that, in order to effectuate this development, the government and private business enter into a *joint venture.*

The municipality's primary role in this venture is to provide public financing of the construction or acquisition of economic development facilities by the issuance of tax-exempt bonds, upon terms similar to those found in the case at bar. As here, the municipality is not liable; rather, the facility pays for itself. Investors enjoy a reasonable return on their investment, the municipality gains a beneficial facility, and private enterprise is established and encouraged.

The Maryland Court of Appeals has considered the issue confronting us. Although it reached a conclusion contrary to our own, a brief analysis of its decision is helpful to explain our determination in the case at bar.

In *Grinnell Company v. City of Crisfield* (1972) 264 Md. 552, 287 A.2d 486, the City of Crisfield, Maryland, acted pursuant to authority granted under Maryland Code, Art. 41, § 266B, to finance, by the issuance of negotiable bonds, the acquisition or construction of industrial property or buildings for the purpose of relieving conditions of unemployment and encouraging the increase of industry in the state. The City entered into an agreement with Rubberset Company providing for the sale and leaseback of certain property and the construction of an addition to an industrial plant owned by Rubberset.

The general contractor for the addition executed performance and payment bonds in accordance with Maryland Code, Art. 90, § 11, which required such bonding prior to the award of any contract for the construction, alteration, or repair of any public building, public work, or public improvement. Grinnell, a subcontractor, was not paid by the contractor, and thereupon it filed a mechanic's lien upon the property. The attempted foreclosure was denied in the trial court.

On appeal, *Grinnell* conceded that, if it had labored under a public construction contract, the following language of *Hamilton and Spiegel, Inc. v. Board of Education* (1963) 233 Md. 196, 195 A.2d 710, 712, would apply:

"The statutory direction that each public construction contract include the furnishing of a payment bond for the protection of materialmen and subcontractors,

refutes the claim that the contract between the Board and the prime contractor intended to make suppliers or subcontractors beneficiaries 'in fact though not in form,' entitled to demand payment direct from the Board. *From the requirement of a payment bond there may soundly be inferred a legislative intent, written into each public construction contract, that the State or other public body is not to have a duty to pay or to see to the payment of materialmen or subcontractors beyond the furnishing of the payment bond.*" (Emphasis added.)

However, *Grinnell* asserted that the construction of an addition to the plant of a private, profit-making company did not constitute a public construction contract. The Maryland Court of Appeals held, at 489 of 287 A.2d:

"In short, we think that the action of the City of Crisfield in financing the acquisition of land and the construction of a plant addition for the Rubberset Company under the authority of Article 41, § 266B served a valid purpose, and consequently is a 'public work or improvement,' as those words are intended in Article 90, § 11. Having determined that the plant addition falls within the ambit of Article 90, § 11, it follows from *Hamilton, supra,* and the other cases we have cited that a mechanics' lien was an unavailable remedy for the appellant to pursue against the City of Crisfield."

■ According to the express terms of and case law interpreting our statutes, economic development facilities which are constructed, acquired, or repaired under Ind.Code 18–6–4.5–1 *et seq.* are not public buildings, works, or improvements subject to the mandatory withholding and bonding requirements set forth in Ind.Code 5–16–5–1 *et seq.* It is certainly a good business practice to require such bonds by the terms of the contract, but they are not required.

In the instant case, Green Construction did not execute, and was not called upon by the City to execute, performance or payment bonds. This was largely due to the fact that the transaction was concerned more with the acquisition than with the construction of the garage. Nonetheless, since the subcontractors, materialmen, *et al.* were not, and are not, afforded the statutory protection of mandatory withholding and bonding, they must be allowed to pursue their remedy under the provisions of the mechanic's lien statutes.

It is important to note that the economic bonds are secured by a first mortgage, see footnote 3, further weakening the City's contention that this is the type of property to which liens cannot attach.

*Issue Two*

■ According to the express terms of Ind.Code 32–8–3–1 (Supp.1979), contractors, subcontractors, mechanics, lessors of equipment or tools, journeymen, laborers, and all other persons performing labor or furnishing materials or machinery may assert a lien upon the property subject to improvement. While materialmen are within the protected class, the phrase "all other persons" has not been construed to permit a lien by those parties whose contribution to the effort is remote. Being in derogation of the common law, the mechanic's lien statutes must be strictly construed when determining those persons entitled to acquire and enforce such liens; being remedial in nature, they must be liberally construed when determining the remedies available to persons who have satisfied the strict provisions of the law. *Toner v. Whybrew* (1912) 50 Ind.App. 387, 98 N.E. 450.

■ As mentioned above, the purpose of the mechanic's lien laws is to promote honesty and fair dealing among the parties to a construction contract and to prevent unjust enrichment of the owner who enjoys the material improvement of his property. As a general rule, a mechanic's lien must arise out of the express or implied consent of the owner or person whose interest in the realty is proposed to be bound by the lien. *Johnson v. Spencer* (1912) 49 Ind.App. 166, 96 N.E. 1041. Thus, materialmen who directly supply the owner are permitted a lien upon the property. *Van Wells v. Stanray Corporation* (1976) Ind.App., 341 N.E.2d 198. The law considers the immediate, or

general, contractor to be the agent of the owner insofar as it is reasonably necessary to carry out the contract. Thus, materialmen who supply a contractor are permitted to file a lien. *Waverly Company v. Moran Electric Service, Inc.* (1940) 108 Ind.App. 75, 26 N.E.2d 55; *Colter v. Frese* (1873) 45 Ind. 96. A subcontractor is within this chain of authority and may contract with materialmen for supplies necessary to the performance of his portion of the general contract. *Indianapolis Power and Light Co. v. Southeastern Supply Co., Inc.* (1970) 146 Ind.App. 554, 257 N.E.2d 722; *Barker v. Buell* (1871) 35 Ind. 297. However, materialmen supplying others who must themselves be considered materialmen have traditionally been considered outside the ambit of the statute. *Wood v. Isgrigg Lumber Company* (1919) 71 Ind.App. 64, 123 N.E. 702; *Rudolf Hegener Company v. Frost* (1915) 60 Ind.App. 108, 108 N.E. 16; *Caulfield v. Polk* (1897) 17 Ind.App. 429, 46 N.E. 932.[4]

■ Verplank concedes that he is a materialman. However, the trial court specially found that Corley is a *contractor* within the meaning of the mechanic's lien laws, and therefore Verplank comes within the terms of the statute. In reviewing a trial court's finding that a materialmen is entitled to a mechanic's lien, we view the evidence in the light most favorable to the trial court's finding, and reverse only upon determining that the finding is clearly erroneous. *Van Wells, supra.*

It is clear from the evidence presented that, at the time Corley and Verplank began to perform, the property was *owned* by Green Construction. Further, Verplank admits that Green Construction hired an architect, a structural engineer, and a project supervisor, poured the foundation and ramps, erected the building, and added extra bracing and an eighth floor sports facility. These facts lead to but one conclusion:

Green Construction served as its own *general* contractor. However, the judgment may also stand if Corley was a *sub* contractor, and we are obliged to consider that possibility.

In *Foster Lumber Company v. Sigma Chi Chapter House of DePauw University* (1912) 49 Ind.App. 528, 97 N.E. 801, a fraternity engaged a general contractor to furnish all materials and labor in the erection of a new chapter house. Charles H. Springer undertook to furnish the contractor with all the finished stonework necessary to the construction of the building. The fraternity argued that Springer was a subcontractor and therefore, according to the terms of the mechanic's lien statutes then in effect, not entitled to a lien. The court held, at 803 of 97 N.E.:

"We do not see any reason why he ceased to be a materialman because he furnished all the stone, instead of a part; *nor·do we think material ceases to be material when it is finished and ready for use.* Judge Elliott, in *Farmers' Loan & Trust Co. v. Canada & St. L. R. Co.*, 127 Ind. 250, 257, 26 N.E. 784, 11 L.R.A. 740, defines a subcontractor as one who takes from the principal contractor a specific part of the work. We understand this to mean a specific part of the work in the *actual construction of the building*, and may include furnishing the materials therefor." (Emphasis added.)

In *Rudolf Hegener Company, supra*, George Clinton entered into a contract with Frost to furnish two flights of stairs, completed and manufactured after a special design expressly for a house which the owner, Frost, was building. Clinton was not obligated to install the stairs, but was responsible only for delivering them to the premises. Clinton subsequently contracted Hegener, a custom manufacturer, to construct the stairs at its Chicago factory. The

---

4. Although in some cases materialmen have been denominated subcontractors for the purpose of bringing them within or without the terms of certain public or private payment bonds, *Nash Engineering Company v. Marcy*

*Realty Corporation, Inc.* (1944) 222 Ind. 396, 54 N.E.2d 263; *Western Casualty & Surety Company v. State* (1970) 146 Ind.App. 431, 256 N.E.2d 398, they are not subcontractors within the meaning of the mechanic's lien statutes.

crucial issue was, of course, whether Clinton was a subcontractor or materialman.

The court, at 16–17 of 108 N.E., cited Phillips on Mechanic's Liens (3rd Ed.) § 51, which states:

> "There is, however, a palpable distinction between a contract *to erect* and a contract to furnish towards the erection, whether it be work or materials. One who contracts to put up a building, or one of its leading divisions, as its brickwork or its woodwork, is not a mere workman, or a mere materialman. He is employed to construct or erect, and not merely to work. It is therefore clear that a lumber dealer, employed merely to furnish lumber, *whether manufactured or not,* is not a contractor for the erection of the building or any division of it. He is a *materialman* merely, or a workman, if he works up his lumber into frames, doors, etc., and *is not employed to erect or put up the building or any of its primary divisions."* (Emphasis added.)

Thus, the court held that Clinton was a materialman, and Hegener was not within the coverage of the statute.

**[10, 11]** These same principles applied to the facts in the case at bar require a finding that Corley is a materialman. Although he may have provided materials of substantial size and unquestionable specificity, he was not responsible for the erection of the structure on the construction site in Evansville. Thus, Verplank is the materialman of a materialman and may not assert a lien upon the property.[5]

The judgment is reversed.

ROBERTSON, P. J., and RATLIFF, J., concur.

---

5. We find additional support for our decision in the statutory provisions of Ind.Code 5-16-5.-5-1 *et seq.* which govern the payment of *subcontractors* involved in a public project from funds withheld pursuant to Ind.Code 5-16-5-1, the purpose of which we have considered hereinabove. Ind.Code 5-16-5.5-1(g) (Supp.1979) provides:

> "(g) The term *'subcontractor'* shall mean and include any person, firm or corporation who is a party to a contract with the contrac-

tor and who furnishes and *performs on-site labor* on any public building, work or improvement. It also shall include *materialmen* [sic] who supply contractors or *subcontractors as contained herein."* (Emphasis added.)

Thus, only those materialmen who supply persons performing on-site labor are protected. Materialmen of materialmen are outside the ambit of the statute.

2. Jury ⊷ 33(5)