[Nos. 18295-1-I; 18369-9-I.  Division One.  August 3, 1987.]

FARWEST STEEL CORPORATION, *Appellant*, v. MAINLINE METAL WORKS, INC., *Defendant*, HENSEL PHELPS CONSTRUCTION COMPANY, ET AL, *Respondents*.

VALLEY WELDING SUPPLY COMPANY, *Appellant*, v. THE UNIVERSITY OF WASHINGTON BOARD OF REGENTS, ET AL, *Respondents*.

*Ronald T. Schaps* and *Bogle & Gates* (*Thomas B. Russell* and *Gleaves, Swearingen, Larsen & Potter*, of counsel), for appellants.

*John S. Riper* and *Oles, Morrison, Rinker, Stanislaw & Ashbaugh; Kenneth O. Eikenberry, Attorney General,* and *Gary L. Ikeda, Assistant,* for respondents.

WALTERSKIRCHEN, J.*—The court has consolidated these cases for the issuance of its opinion.

## NATURE OF THE CASE

Farwest Steel Corporation appeals from the dismissal by summary judgment of all its claims against Hensel Phelps Construction Company and its surety, Aetna Casualty & Surety Company. Farwest assigns error to the granting of Hensel's motion for summary judgment dismissing Farwest's claims against the project's retainage fund, against the public works bond, and for dismissing its claim for quantum meruit or unjust enrichment.

Valley Welding Supply Company appeals from the dismissal by summary judgment of its claim against Hensel and the University of Washington on the public works retainage fund.

---

*This appeal was heard by a Supreme Court Justice, a Superior Court Judge, and a retired Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

STATEMENT OF THE FACTS

Hensel is the prime contractor on a $34,275,000 addition to the University of Washington Hospital. Hensel contracted with Mainline Metal Works, Incorporated to fabricate and furnish to Hensel metal items for $225,000. All materials supplied by Mainline came from its Oregon facility and were delivered to the jobsite. Mainline did the fabricating in Oregon, and did no on-site labor, installation, or supervision. Mainline contracted with Farwest to supply its steel requirements for the Hensel contract. Valley supplied welding materials and other supplies to Mainline for the same contract. Upon its first delivery to Mainline, Farwest notified Hensel that it was commencing deliveries to Mainline for the Hensel project.

Mainline went into bankruptcy before completing its contract with Hensel. By that time Mainline had accumulated an unpaid balance of $150,000 due to Farwest and $16,520 to Valley. Mainline was required to provide Hensel a certified statement listing any significant debts incurred by Mainline in manufacturing the contract items before Hensel would pay Mainline for them. To obtain its periodic payments from Hensel Mainline falsely certified that it owed nothing to Farwest and Valley. Neither Farwest nor Valley had ever given notice to Hensel that they were not being paid by Mainline.

Farwest and Valley filed their respective suits, each claiming that since Mainline had not paid them, they had a valid claim against the public works retainage fund pursuant to RCW 60.28.010. In addition, Farwest also claimed it was entitled to recover from the public works bond required by RCW 39.08.030. Farwest also claimed it was entitled to recover on the basis of quantum meruit and unjust enrichment. Hensel denied all claims in both suits. Farwest also sued Mainline and secured a judgment for the full amount Mainline owed it. Mainline has not paid the judgment.

On October 28, 1985, Superior Court Judge Gerard M. Shellan granted summary judgment dismissing Farwest's

bond and retainage claims against Hensel and Aetna, Hensel's surety. On December 9, 1985, Superior Court Judge Stephen M. Reilly granted summary judgment dismissing Farwest's quantum meruit and unjust enrichment claims. On March 25, 1986, Superior Court Judge James McCutcheon granted summary judgment dismissing Valley's suit.

ISSUE I

Was Mainline a materialman for Hensel under Hensel's prime contract with the University of Washington where Mainline fabricated materials in its own plant in Oregon, but did no on–site labor, installation, or supervision, and the value of Mainline's contract was less than 1 percent of the total project?

The trial court did not err in characterizing Mainline as a materialman of the prime contractor rather than as a subcontractor, and therefore dismissing Farwest's claim under Washington's public works bond, RCW 39.08.010, and Farwest's and Valley's public works retainage claims under RCW 60.28.010. These statutes cover material suppliers of subcontractors but not material suppliers of materialmen. In order for Farwest and Valley to recover under these statutes Mainline must be found to be a subcontractor.

Both statutes use the terms "subcontractor" and "materialman," but neither statute defines them. Absent statutory definition the terms must be given their plain and ordinary meanings. *Garrison v. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976). A subcontractor is "one who takes from the principal contractor a specific part of the work, and the term does not include laborers or materialmen." *Baker v. Yakima Vly. Canal Co.*, 77 Wash. 70, 74, 137 P. 342 (1913). Black's Law Dictionary (4th ed. 1951) defines a materialman as a person "who has furnished materials used in the construction or repair of a building, structure, or vessel." There is no Washington case defining materialmen. *Cf. J.D. English Steel Co. v. Tacoma Sch. Dist. 10*, 57 Wn.2d 502, 358 P.2d 319 (1961) (court expressly declined to review the trial court's finding that a

party was a materialman).

There is, however, extensive authority from federal and other jurisdictions distinguishing subcontractors and materialmen in which two basic tests are set forth. Some courts distinguish the two roles by whether there has been any on-site installation or supervision. Other courts use the 2-part substantial relationship test, first articulated in *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 88 L. Ed. 1163, 64 S. Ct. 890 (1944), and refined in subsequent cases, which defines a subcontractor as one who (1) performs or takes from the prime contractor a specific part of the labor or material requirements of the original contract and (2) has a substantial and important relationship with the prime contractor. It appears that a substantial and important relationship does not exist where the value of the contract is less than 10 percent of the value of the prime contract.

Most of the cases involving the "substantial relationship" test concern the Miller Act, 47 Stat. 793 (current version at 40 U.S.C. § 270a *et seq.* (1982)). The Miller Act requires that federal contractors furnish a payment bond for the protection of all persons supplying labor and materials, 40 U.S.C. § 270a (1982), to the prime contractor or subcontractors, 40 U.S.C. § 270b (1982). The act's purpose parallels that of Washington's bond statute, *i.e.*, to protect from default persons supplying labor and materials to federal contractors and subcontractors. *See, e.g., United States ex rel. Sherman v. Carter*, 353 U.S. 210, 1 L. Ed. 2d 776, 77 S. Ct. 793 (1957). One who supplies materials to a materialman is not protected by the act. *E.g., United States ex rel. Wellman Eng'g Co. v. MSI Corp.*, 350 F.2d 285 (2d Cir. 1965).

*F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 40 L. Ed. 2d 703, 94 S. Ct. 2157 (1974) applied the substantial relationship test in the context of the Miller Act. The Supreme Court found that the Cerpac Co. was a subcontractor where it was clearly intertwined with the prime contractor, had a long-term working rela-

tionship with the prime contractor, and had been awarded both a supply and an installation contract in a particular federal project. In applying the "substantial and important relationship" leg of the 2–part test the Court looked at the total relationship between Cerpac and the prime contractor to determine whether Cerpac was a subcontractor. The Court stated: "It is the substantiality of the relationship which will usually determine whether the prime contractor can protect himself, since he can easily require bond security or other protection from those few 'subcontractors' with whom he has a substantial relationship in the performance of the contract." *F.D. Rich Co.,* at 123–24.

In *Aetna Cas. & Sur. Co. v. United States ex rel. Gibson Steel Co.,* 382 F.2d 615, 618 (5th Cir. 1967), the court held that a company that fabricated steel items such as stairs, ladders, and trench covers and frames for a federal construction project, and whose contract amounted to only 2 percent of the value of the total project, did not have a sufficiently important relationship with the prime contractor to be considered a subcontractor under the Miller Act. The company was instead a materialman under the contract. The contract required the company to supply custom–built miscellaneous steel and iron products in accordance with the specifications set forth in the prime contract. In applying the substantial relationship test the court noted that a substantial and important relationship exists between an entity and a prime contractor where the entity has taken a "large and definable part of the construction project". *Aetna,* at 617. The court continued, "[c]ustom manufacturing is simply not enough in itself to establish the relationship of responsibility and importance necessary to render a middle party a subcontractor." *Aetna,* at 617. In addition to the nature of the supplied items, the court considered that the supplier's contract amounted to approximately 2 percent of the total construction cost and that there had been no on–site work, either installation or supervision.

In *LaGrand Steel Prods. Co. v. A.S.C. Constructors, Inc.,*

108 Idaho 817, 702 P.2d 855 (Ct. App. 1985), the court found that a steel fabricator was a subcontractor for the purpose of an Idaho statute substantially similar to the Miller Act. The court relied on the 2–part substantial relationship test in its determination. The court read the test in light of the statute's overriding purpose of limiting the protection of the bond to those who are in direct contractual relationship with the prime contractor or subcontractors. *LaGrand,* 702 P.2d at 856. In *LaGrand* the subcontractor provided custom fabrication of steel; the work was not unduly complicated and it was performed exclusively off–site; and the contract involved no erection or supervision thereof. However, the court found it particularly significant that in this case the contract involved greater than $1 million and constituted approximately 10 percent of the total prime contract. The court continued, "[a] contract of such economic dimension connotes a substantial, important relationship with the prime contractor." *LaGrand,* at 819. Also important was that the prime contractor deemed the fabricator's role in the project sufficiently important to secure personal performance guaranties. These two factors persuaded the court that the fabricator had a substantial and important relationship with the contractor and hence was a subcontractor.

Other cases are consistent. *See Miller Equip. Co. v. Colonial Steel & Iron Co.,* 383 F.2d 669 (4th Cir. 1967) (party was a subcontractor whose contract with the prime contractor was greater than 15 percent of the total contract and 64 percent of a fundamental provision of the contract); *United States ex rel. Pioneer Steel Co. v. Ellis Constr. Co.,* 398 F. Supp. 719 (E.D. Tenn. 1975) (party was a materialman who custom manufactured steel items for the project and whose contribution to the total cost of improvement was less than 9 percent, which was not a sufficiently large and definable part of the project); *Theisen v. County of Los Angeles,* 54 Cal. 2d 170, 352 P.2d 529, 5 Cal. Rptr. 161, 169–70 (1960). *But cf. United States ex rel. Hardwood Prods. Corp. v. John A. Johnson & Sons,* 137 F. Supp. 562

(W.D. Pa. 1955) (door manufacturer held to be a subcontractor; no reference to the substantial and important relationship leg of *MacEvoy* test).

Another common test to distinguish subcontractors and materialmen simply looks to whether the party performed any on–site work, either installation or supervision. Subcontractors perform on site; materialmen do not. *See, e.g., Evansville v. Verplank Concrete & Supply, Inc.*, 400 N.E.2d 812, 820 (Ind. Ct. App. 1980); *American Bldgs. Co. v. Wheelers Stores*, 585 P.2d 845, 847–48 (Wyo. 1978). Courts applying the substantial relationship test also may consider the presence or absence of on–site work to be a significant factor. *See, e.g., Aetna Cas. & Sur. Co. v. United States ex rel. Gibson Steel Co.*, 382 F.2d 615, 618 (5th Cir. 1967).

In the instant case Mainline is a materialman under either test. It performed no on–site work of any sort. Mainline had only an unsubstantial portion (less than 1 percent) of the total project amount rather than a large and definable part. The items it supplied were not complex or of great importance in relation to the entire hospital expansion project. Mainline supplied only miscellaneous metal items such as handrails, metal stairs, metal gratings, and countertop supports. Mainline did custom fabricate goods for the project, but such fabrication is not by itself sufficient to establish a substantial relationship. There is no evidence that Mainline and Hensel were closely intertwined or had any relationship outside the contract. Mainline was a materialman under both the substantial relationship and the on–site work tests. Therefore Mainline's supplier, Farwest, was a materialman of a materialman of the University of Washington Hospital project and is not protected by Washington's bond statute.

## ISSUE II

Is a material supplier to a materialman to a general contractor entitled to claim a lien on the retainage fund pursuant to RCW 60.28.010 where the materialman failed to

pay its supplier for materials which were ultimately passed on to the contractor?

Washington's retainage statute reads in part:

(1) Contracts for public improvements or work, other than for professional services, by the state, or any county, city, town, district, board, or other public body, herein referred to as "public body", shall provide, and there shall be reserved by the public body from the moneys earned by the contractor on estimates during the progress of the improvement or work, a sum not to exceed five percent, said sum to be retained by the state, county, city, town, district, board, or other public body, as a trust fund for the protection and payment of any person or persons, mechanic, subcontractor or material-man who shall perform any labor upon such contract or the doing of said work, and all persons who shall supply such person or persons or subcontractors with provisions and supplies for the carrying on of such work . . . Every person performing labor or furnishing supplies toward the completion of said improvement or work shall have a lien upon said moneys so reserved . . .

RCW 60.28.010.

The language of the statute does not answer whether a materialman of a materialman of a contractor is protected by the fund. The pertinent parts of the statute provide that a retainage fund shall be established from the moneys earned by a contractor from a public works contract for the protection and payment of any materialman "who shall perform any labor upon such contract or the doing of said work, and all persons who shall supply such person or persons or subcontractors with provisions and supplies . . ." A lien upon the fund shall be available to "[e]very person performing labor or furnishing supplies" for the project. The first part of the statute establishes the fund and determines coverage. The second provides the lien upon the fund. Both sections of the statute should be read together. *See Cox v. Helenius*, 103 Wn.2d 383, 387–88, 693 P.2d 683, 686 (1985).

Contrary to the contentions of both parties, the phrase of the statute central to the issue of coverage is the following:

"materialmen who shall perform any labor upon such contract or the doing of said work". If Mainline performed any labor upon the Hensel contract or the doing of the project then it became one of the persons whose suppliers are protected.

The key clause sheds little light onto the issue of whether materialmen of materialmen are covered by the statute. On the one hand, even the most remote supplier can be imagined to have performed some attenuated degree of labor on the prime contract. On the other hand, a strict construction limits coverage to materialmen who actually contribute labor directly to the construction of the project, as opposed to contributing labor solely to the fabrication of materials for the project.

There is no authority interpreting this clause. Respondent cites *Harbor Millwork, Inc. v. Achttien,* 6 Wn. App. 808, 496 P.2d 978 (1972), but upon examination the case does not support respondent's contention that Washington courts have rejected the notion that fabrication by a materialman constitutes labor on a job. The *Harbor Millwork* court was interpreting an exemption to a contractor registration statute, RCW 18.27.090(8). The pertinent language was whether the person who furnished supplies or materials "fabricat[ed] them into, or consum[ed] them in the performance of, the work of the contractor". This language differs on its face from that of the retainage statute. In addition, the respondent ignored the court's discussion that:

the materialmen's lien law has a different objective from the contractor's registration act. It is a truism of statutory construction that a statute is to receive an interpretation consistent with its own purpose. The contractor's law has a different purpose from the lien law. . . . Interpretations of one statute supply no talisman for interpreting the other.

(Citations omitted.) *Harbor Millwork,* at 815–16.

Respondent asserts that the scope of the coverage of the retainage statute should be interpreted similarly to Wash-

ington's public bond statute, RCW 39.08.010, which clearly limits its protection to the prime contractor's work force and to the contractor's and the subcontractor's materialmen. However, the court in *Norris Indus. v. Halverson–Mason Constructors,* 12 Wn. App. 393, 529 P.2d 1113 (1974) disagreed. The *Norris* court found instead that the retainage statute was "analogous to the materialman's lien against private works under RCW 60.04.010 *et seq.*" rather than to the bond statute. (Footnote omitted.) *Norris Indus.,* at 398; *see also Norris Indus.,* at 398–99. Although the *Norris* court was concerned with the question of the proper measure of damages under the retainage statute, there is no language in its opinion limiting the quoted passage to the measure of damages issue.

■ Moreover there is good reason to look to private materialman's lien statutes as a guide for interpreting the scope of the retainage statute. The retainage statute was enacted to remedy problems resulting from the fact that public property is not subject to mechanics' or materialman's liens. *Hall & Olswang v. Aetna Cas. & Sur. Co.,* 161 Wash. 38, 47, 296 P. 162 (1931). Given this purpose and the lack of evidence of a different or contrary purpose, it is apparent that the retainage law covers the same individuals who would be covered by the materialman's liens statutes had the individuals not been supplying a public project. Consequently, authority ascertaining the scope of the mechanics' or materialman's lien statutes are instructive in determining the scope of the retainage statute.

It is the majority rule that a materialman of a materialman of a contractor has too remote a relationship to fall within the lien statutes. *See, e.g., Pacific Rolling Mills Co. v. James Street Constr. Co.,* 68 F. 966, 971–72 (9th Cir. 1895) (applying Washington law); *Evansville v. Verplank Concrete & Supply, Inc.,* 400 N.E.2d 812, 819 (Ind. Ct. App. 1980); *Georgia–Pacific Corp. v. Dan Austin Properties, Inc.,* 126 Ga. App. 191, 190 S.E.2d 131, 132, *aff'd,* 229 Ga. 803, 194 S.E.2d 472 (1972); *Kingston Trust Co. v. State,* 57 Misc. 2d 55, 291 N.Y.S.2d 208, 210 (1968); Annot.,

24 A.L.R.4th 963 (1983), and cases cited therein.

The analysis provided in *Evansville v. Verplank Concrete & Supply, Inc., supra,* is typical of the cases adhering to the majority rule. The court noted that mechanics' liens statutes are in derogation of the common law so they must be strictly construed when determining those persons entitled to acquire and enforce such liens. *Evansville,* at 818. Materialmen who directly supply the owner are permitted a lien upon the property. Contractors are agents of the owner insofar as it is reasonably necessary to carry out a contract, and subcontractors are also within the chain of authority. Hence suppliers of contractors and subcontractors are permitted to file a lien. However, materialmen supplying other materialmen are not within the chain of authority and have traditionally been outside the lien statute. *Evansville,* at 818–19.

*Pacific Rolling Mills Co. v. James Street Constr. Co., supra,* also involved a lien of a materialman of a materialman of a contractor. In construing Washington's lien statute the court stated, "[t]he statute does not contemplate a lien in favor of him who sells materials to one who in turn sells the same to the owner or his agent. It gives the lien only to him who deals with the owner or his agent, or with a contractor in charge, or with some other person in charge of some part of the improvement for which the materials are to be used." *Pacific Rolling Mills,* at 972.

Although there are no recent Washington cases considering this issue there are many recent cases affirming the rule that since Washington's materialman's lien statute, RCW 60.04.010, is in derogation of the common law its terms must be strictly construed and hence the statute will not be extended to benefit those who do not come clearly within its terms. *See, e.g., Wells v. Scott,* 75 Wn.2d 922, 454 P.2d 378 (1969); *Fair Price House Moving Co. v. Pacleb,* 42 Wn. App. 813, 714 P.2d 321 (1986); *Northlake Concrete Prods., Inc. v. Wylie,* 34 Wn. App. 810, 663 P.2d 1380 (1983). Materialmen of materialmen do not come clearly within the terms of the materialman's lien statute. It apparently

remains the rule in Washington that the materialman's lien statute does not extend coverage to materialmen of a materialman of a contractor.

The language of the Washington materialman's lien statute is more precise than that of the retainage statute as to the scope of coverage. The language is clear that the materialmen of a materialman of a contractor are not covered. The language of the retainage statute is not clear. However, since the retainage statute is analogous to the materialman's lien statute and since the purpose of the retainage statute is to provide a substitute to materialman's liens, which are unavailable on public projects, there is no reason to extend the scope of coverage beyond that allowed by the materialman's lien statute. Consequently the retainage statute does not provide a right to a lien on retained funds to a materialman of a materialman of a contractor on a public project. The trial court did not err by granting respondent's motions for summary judgment dismissing appellants' claims against the public works retainage.

## ISSUE III

Was Hensel unjustly enriched by Farwest where Hensel failed to pay Mainline fully for metal items fabricated by Mainline with steel supplied by Farwest to Mainline for which Mainline did not pay, but where Hensel neither dealt with Farwest nor committed any act of bad faith toward Farwest?

■ The superior court correctly ruled that Farwest had not unjustly enriched Hensel. Although alleged as two causes of action, Farwest's quantum meruit and unjust enrichment claims are inseparable. Quantum meruit and unjust enrichment are a measure of recovery for a party asserting a contract implied at law. "Unjust enrichment, or quantum meruit, is a contract implied at law requiring a party to make restitution to the extent he has been unjustly enriched." *Truckweld Equip. Co. v. Olson,* 26 Wn. App. 638, 646, 618 P.2d 1017 (1980).

A person has been unjustly enriched when he has prof-

ited or enriched himself at the expense of another contrary to equity. *Lloyd v. Ridgefield Lumber Ass'n*, 38 Wn.2d 723, 736, 231 P.2d 613 (1951); *Bennion v. Comstock Inv. Corp.*, 18 Wn. App. 266, 273, 566 P.2d 1289 (1977); Restatement of Restitution § 1 (1937). It is essential that enrichment be unjust and, in this case, at Farwest's expense. *See Chemical Bank v. WPPSS*, 102 Wn.2d 874, 909, 691 P.2d 524, *cert. denied*, 471 U.S. 1065 (1984). Enrichment alone will not suffice to invoke the remedial powers of a court of equity. It is critical that the enrichment be unjust both under the circumstances and as between the two parties to the transaction. *E.g., McGrath v. Hilding*, 41 N.Y.2d 625, 363 N.E.2d 328, 331, 394 N.Y.S.2d 603 (1977).

The general rule applicable in the instant case is as follows:

> The mere fact that a third person benefits from a contract between two other persons does not make such third person liable in quasi contract, unjust enrichment, or restitution. Moreover, where a third person benefits from a contract entered into between two other persons, in the absence of some misleading act by the third person, the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person. In other words, a person who has conferred a benefit upon another, by the performance of a contract with a third person, is not entitled to restitution from the other merely because of the failure of performance by the third person.

(Footnotes omitted.) 66 Am. Jur. 2d *Restitution and Implied Contracts* § 16, at 960 (1973); *see also* 66 Am. Jur. 2d § 3, at 946; Restatement of Restitution § 110 (1937).

Viewing the facts in a light most favorable to appellant, *see Wilson v. Steinbach*, 98 Wn.2d 434, 656 P.2d 1030 (1982), respondent was enriched by receiving but not paying fully for metal goods supplied by Mainline. There is no evidence, however, that the enrichment was unjust with respect to Farwest or at Farwest's expense. Hensel was a mere incidental beneficiary of the contract between Farwest and Mainline. Hensel did not acquiesce in or encourage the

contract with Farwest. Hensel did not mislead Farwest in any fashion. In short, Hensel did not contribute in any fashion to Farwest's loss. In addition, Hensel's enrichment was not at Farwest's expense since Hensel is in debt exclusively to Mainline and there is no reason to believe that Farwest would benefit if Mainline were paid, in light of Mainline's bankruptcy and past conduct toward Farwest.

The cases cited by appellant in support of its contention that Hensel was unjustly enriched at appellant's expense are in fact consistent with the above cases and analysis. Each case involved some clear act of bad faith by the defendant resulting in the defendant's unjust enrichment at the plaintiff's expense.

Viewing the facts most favorably to the appellant, Hensel was not unjustly enriched in this case. The trial court properly granted Hensel's motion dismissing Farwest's unjust enrichment and quantum meruit claims.

Moreover, when Mainline defaulted on its contract with Hensel Mainline had already been paid over $200,000 of the total of $225,000. As a result of Mainline's default Hensel had to have a third party complete the Mainline contract at an additional cost of $60,000, so Hensel owed Mainline nothing and had a cause of action against Mainline for the $35,000 extra Hensel had to pay because of Mainline's default.

Judgments in both cases are affirmed.

ANDERSEN and MATTSON, JJ. Pro Tem., concur.

Review denied by Supreme Court November 3, 1987.