73 P.3d 424 (2003)
117 Wash.App. 899
BETTER FINANCIAL SOLUTIONS, INC., a Washington corporation, Respondent,
v.
CAICOS CORPORATION, a Washington corporation; and Insurance Company of the West, a bonding company, Appellants,
MK Construction, Inc., a Washington corporation; Metropolitan Park District of Tacoma, a municipal corporation, Defendants.
No. 29031-6-II.
Court of Appeals of Washington, Division 2.
July 29, 2003.
Reconsideration Denied August 29, 2003.
*425 Jason Richard Wandler, Bradley Lew Powell, Oles Morrison Rinker & Baker LLP, Seattle, WA, for appellants.
Mark A. Clausen, Linville Clausen & Linton, Seattle, WA, for respondents.
BRIDGEWATER, J.
Better Financial Solutions, Inc. claimed, under RCW 30.08.010 and RCW 60.28.011, against Caicos Corporation's payment/performance bond and the retainage fund held by the Metropolitan Parks District of Tacoma (Metro) for compensation related to its services on the Dickman Mill Park Restoration Project. The trial court granted summary judgment in favor of Better Financial Solutions, Inc. (BFS), finding that BFS was a subcontractor on the project and was therefore a proper claimant under the lien statutes. The defendants appeal, claiming that BFS was not within the protected class under either lien statute. We hold that BFS is not within either statute's protected class under its provider of labor theory. We also hold that, because its function on the projectproviding laborersbore no nexus with the project's actual construction, BFS was not a subcontractor. Therefore, we reverse.

FACTS
In 2000, Metro awarded Caicos Corporation (Caicos) the construction contract for the Dickman Mill Park Restoration Project, Phase I. As RCW 39.08.010 requires, Caicos posted a payment/performance bond for the contract amount. The Insurance Company of the West issued the bond. And as required by the public works retainage statute, RCW 60.28.011(1), Metro retained a certain percentage of its contract payments to Caicos.
Caicos subcontracted the project's concrete work to MK Construction, Inc., who specializes in concrete work. Mike Kercheval is the principal of MK Construction. Because it was a relatively small concern, MK lacked the capacity and expertise necessary to comply with many requirements and regulations incumbent on it as a subcontractor on the project. MK therefore entered into an "AGREEMENT TO SUPPLY TEMPORARY LABOR" with BFS. Exhibit 1.
BFS is a temporary labor services provider whose business is to provide employees to construction firms that lack the employee capacity to perform particular jobs. The company has no operating agreement with, nor is it a member of, any union organization. BFS does not serve the concrete industry exclusively; it supplies laborers to small contractors generally.
*426 Here, BFS contracted individually with qualified union cement masons (laborers) to perform the work subcontracted by MK. But the BFS-MK agreement left "full control over the means and methods of work and procedures to be used" to MK, and it generally disclaimed BFS's responsibility for any laborer activities. Exhibit 1. Consistent with these terms, MK supervised the laborers' work on the Dickman project, and BFS neither provided supplies or materials nor constructed any portion of the project. Also, BFS bore none of the cost associated with removing and reinstalling a portion of the concrete that was poured improperly.
BFS did, however, perform certain functions. As to each employee, BFS paid industrial insurance premiums and unemployment insurance, filed returns with the Department of Labor and Industries and the state Employment Security Department, and withheld amounts required for federal tax, Medicare and FICA purposes. BFS received a mark up of 20 percent above these costs in exchange for its services.
When the concrete work on the project was complete, MK owed BFS $20,249.69 under the terms of their agreement. Although the MK-BFS agreement obligated MK for this amount, the parties had previously agreed to a payment scheme under which Caicos would pay BFS and MK by joint check. Caicos's second such check, which was for $7,600 and was payable to MK and BFS jointly, was deposited by MK without BFS's endorsement. BFS received neither the funds that it was entitled to under this check nor the principal amount owed by MK. BFS has not sued MK or any bank for honoring the second joint check.
BFS did, however, bring a claim under the payment/performance bond and the retainage fund, naming Caicos, the Insurance Company of the West, and Metro as defendants. The trial court determined that BFS was a subcontractor and thus a proper claimant under RCW 39.08.010 and RCW 60.28.011. It entered judgment for $33,877.05 in favor of BFS. This amount included a principal judgment of $20,249.69 and attorney fees of $9,920. Interest and costs accounted for the remainder. Caicos Corporation and Insurance Company of the West appeal, claiming that BFS was not a proper claimant under the statutes.

Analysis

I. Protected Class
BFS is entitled to obtain payment under RCW 39.08.010 and RCW 60.28.011 only if it is a proper claimant under those public works lien statutes. See Better Fin. Solutions, Inc. v. Transtech Elec., Inc., 112 Wash. App. 697, 703, 51 P.3d 108 (2002), review denied, 149 Wash.2d 1010, 69 P.3d 874 (2003). This depends on whether BFS is within the class that the statutes aim to protect. See Thompson v. Peninsula Sch. Dist. No. 401, 77 Wash.App. 500, 505, 892 P.2d 760 (1995); TPST Soil Recyclers of Wash. Inc. v. W.F. Anderson Constr., Inc., 91 Wash.App. 297, 300, 957 P.2d 265 (1998) ("Statutory benefits are extended only to those who clearly come within the statute's terms"). As lien statutes are in derogation of the common law, we strictly construe them. Lumberman's of Wash., Inc. v. Barnhardt, 89 Wash.App. 283, 286, 949 P.2d 382 (1997).
Both statutes specify the protected class. The bond statute for contractors on public works projects, RCW 39.08.010, requires that the contractor "pay all laborers, mechanics, and subcontractors and materialmen, and all persons who supply such person or persons, or subcontractors, with provisions and supplies for the carrying on of such work." The retainage statute, RCW 60.28.011, confers a lien in favor of "[e]very person performing labor or furnishing supplies toward the completion of a public improvement contract" against the contractor's retainage bond or the public body's retained amount. RCW 60.28.011(2). Under the retainage statute, a "[p]erson" is "a person or persons, mechanic, subcontractor, or materialperson who performs labor or provides materials for a public improvement contract, and any other person who supplies the person with provisions or supplies for the carrying on of a public improvement contract." RCW 60.28.011(12)(b).
A. Provider of Labor Theory
BFS first asserts that it is within the protected class of both statutes because it *427 provided MK's laborers for the concrete job. BFS argues that the protected class under RCW 39.08.010 "includes a `person claiming to have furnished labor.'" Br. of Resp't at 16. And with respect to the retainage statute, RCW 60.28.011, BFS argues that, by providing laborers, it "perform[ed] any labor." Br. of Resp't at 16.
Division One of the Court of Appeals recently faced the same arguments in Better Financial Solutions, Inc. v. Transtech Elec., Inc., 112 Wash.App. 697, 51 P.3d 108. Transtech involved nearly identical facts and claims. Transtech Electric, Inc., the general contractor on a public works project for the Kent School District, subcontracted with Breland Enterprises to perform concrete work. Breland then contracted with BFS for temporary laborers. The Breland-BFS agreement provided, "[BFS] agrees to supply personnel to work under the CLIENT'S supervision and control." Transtech, 112 Wash.App. at 700, 51 P.3d 108. BFS was to pay wages, taxes, and insurance for the supplied laborers, but it charged a 20 percent return on the funds it paid. Breland retained "full control over the means and methods of work and procedures to be used on the job site." Transtech, 112 Wash.App. at 701, 51 P.3d 108.
As here, BFS claimed under RCW 39.08.010 and RCW 60.28.011, and the defendants argued that BFS was not a proper claimant under the statutes. BFS theorized that it was within RCW 39.08.010's protected class because "it supplied labor to Breland." Transtech, 112 Wash.App. at 704, 51 P.3d 108. Division One affirmed summary judgment against BFS. Addressing the claim under RCW 39.08.010, the court reasoned that "suppliers of labor do not supply provisions, supplies or material ... [they] are not mechanics or materialmen ... [they] are not subcontractors. Suppliers of labor are not, and cannot logically be, laborers as well. Laborers are the individuals who actually perform the work at the job site." Transtech, 112 Wash.App. at 705-06, 51 P.3d 108 (internal citations omitted). And as to the RCW 60.28.011 claim, the court stated that BFS was not within the protected class because it "is not an entity that `performs labor' or `provides materials' or `supplies the person with provisions or supplies.'" Transtech, 112 Wash.App. at 710, 51 P.3d 108 (citing RCW 60.28.011(12)(b)).
BFS claims that Transtech's holding is wrong for two reasons. First, in support of its RCW 39.08.010 claim, BFS cites three cases for the proposition that the "protected class includes a `person claiming to have furnished labor.'"[1] Br. of Resp't at 16. The cases are Bishop v. T. Ryan Constr. Co., 106 Wash. 254, 180 P. 126 (1919), Ledingham v. City of Blaine, 105 Wash. 253, 177 P. 783 (1919), and Nat'l Sur. Co. v. Bratnober Lumber Co., 67 Wash. 601, 122 P. 337 (1912). Division One addressed the same three cases in Transtech. The court flatly rejected any analogy between these cases and BFS's situation, reasoning that the claimants in these cases performed actual labor or furnished supplies to the project while BFS merely provided laborers.
We agree with the distinction drawn by Division One between providing laborers and performing labor. RCW 39.08.010 clearly speaks to persons who actually labor or who supply "provisions and supplies for the carrying on of such work." A person who furnishes individuals who will then actually labor does no act to bring himself within the protected class.
The second reason, which pertains to the RCW 60.28.011 claim, seizes on a perhaps inartful judicial characterization of the statutory phrase "performs" or "performing" labor. RCW 60.28.011(2), (12)(b). In Puget Sound Elec. Workers Health & Welfare Trust Fund v. Merit Co., 123 Wash.2d 565, 567-68, 870 P.2d 960 (1994), the Supreme Court stated that "RCW 60.28.010 requires a public agency to retain a sum ... for the protection and payment of all persons who furnish labor, materials, or supplies." (Emphasis added). The statute actually says *428 "performing labor" and "performs labor." RCW 60.28.011(2),(12)(b) (emphasis added). Without studying the etymological distinctions between "furnish" and "perform," we hold that the statute contemplates persons who do actual labor on the project rather than persons who provide laborers to perform the actual work. Once again, we agree with and accept Division One's distinction between providing laborers and performing labor.
At least as to the provider of labor theory, the issues before us are the same as those presented in Transtech. As BFS fails to establish that Transtech incorrectly analyzed the theory, we hold that BFS is not within the protected class of RCW 39.08.010 or 60.28.011 under the provider of labor theory. Therefore, unless BFS is within the protected class of either statute under the subcontractor theory, the trial court's judgment must be reversed.
B. Subcontractor Theory[2]
Caicos next assigns error to the trial court's conclusion that BFS was a subcontractor. As RCW 39.08.010 and RCW 60.28.011 both specifically include subcontractors, this conclusion placed BFS squarely within each statute's protected class. We hold that BFS was not a subcontractor.
"The determination of whether particular statutory language applies to a factual situation is a conclusion of law." In re Meistrell, 47 Wash.App. 100, 107, 733 P.2d 1004 (1987). Although Caicos challenges Finding 21, it really only disputes the subcontractor conclusion within that finding. The trial court's factual findings are essentially undisputed. Therefore, determining whether BFS was a subcontractor requires that we apply agreed facts to a particular statutory term: "subcontractor." Our review is therefore de novo.
The parties agree that Farwest Steel Co. v. Mainline Metal Works, Inc., 48 Wash.App. 719, 741 P.2d 58, review denied, 109 Wash.2d 1009 (1987), sets forth the controlling definition of "subcontractor." Under Farwest, a subcontractor "(1) performs or takes from the prime contractor a specific part of the labor or material requirements of the original contract and (2) has a substantial and important relationship with the prime contractor." Farwest, 48 Wash.App. at 723, 741 P.2d 58. Farwest also notes that "Subcontractors perform on site."[3]Farwest, 48 Wash.App. at 726, 741 P.2d 58.
Baker v. Yakima Valley Canal Co., 77 Wash. 70, 137 P. 342 (1913), provides an early, yet informative, construction of "subcontractor." Baker concerned the reconstruction of an irrigation canal, for which project the defendant screened and supplied sand and gravel but did not deliver the sand and gravel to the project site. The relevant statute gave "[e]very person performing labor upon or furnishing material to be used in the construction" a lien against subcontractors on the project. Baker, 77 Wash. at 73, 137 P. 342 (citing Rem. & Bel.Code, § 1129). The court held that the defendant was not a subcontractor, according great weight to the defendant's lack of actual, on-site labor on the canal itself. Baker, 77 Wash. at 73, 74, 137 P. 342. Accord, Neary v. Puget Sound Eng'g Co., 114 Wash. 1, 194 P. 830 (1921). These cases establish that a claimant in some way related to a project is not a subcontractor unless his function bears some nexus with the project's physical construction. Although it is unnecessary, under the facts of this case, to delimit the parameters of the required nexus, we recognize that one must exist.
Several factors inform the nexus issue here. First, as illustrated above, BFS contractually limited its involvement, supervision, *429 and responsibility on the project. The BFS-MK agreement states
CLIENT [MK] shall be solely responsible for directing the EMPLOYEE'S [Laborers] activities and shall retain full control over the means and methods of work and procedures to be used at the job site or in the office.... CLIENT shall have responsibility for determining who will be responsible for the supervision of EMPLOYEE.... As indicated above, CLIENT is solely responsible for EMPLOYEE'S activities. It then follows that SUPPLIER [BFS] is not so responsible.
Exhibit 1.
Although these terms do not conclusively illustrate BFS's actual function on the project, they indicate that BFS intentionally divorced itself, at least prospectively, of many of the indicia of control and involvement that a subcontractor commonly bears. BFS clearly wished to have no on-site function with respect to the project's construction.
BFS asserts that, despite the agreement's unambiguous terms, it supervised the project in a manner that establishes the necessary nexus between subcontractor and project. BFS states that "A regular BFS employee, Bill McMahan, regularly visited the site and evaluated the quality of its workers." Br. of Resp't at 19. While the statement is accurate the trial court did find that Bill McMahan "periodically visited the site to determine that the labor supplied by BFS was performing properly and that there was satisfaction with the workers" (CP at 33)it falls well short of establishing that BFS supervised MK's work. The finding connotes a supervisory role focused on administrative issues such as worker timeliness, behavior, and ethic; it does not establish any nexus between the supervision and the project's actual construction.
Michael McMahan's[4] testimony confirms the point. He stated:
[Bill McMahan's] job is kind of a liaison between our office and the job site, so he called up and introduced himself to the supervisor for Caicos that would supervise our clients' work, went down, met him, reviewed work that was done, and asked, `How is everything going? Are the men showing up on time? Is everything going well? If you've got any questions, please contact us.'"
1 Report of Proceedings (RP) (May 28, 2002) at 108.
Michael McMahan also clarified who supervised the laborers' actual construction, stating "MK Construction [was] responsible for the supervision of the employees. I don't know enough about concrete or any of the other individual areas that I would supervise them." 1 RP at 48. The trial court then accepted this characterization of the supervisory roles, finding that "BFS supplied the labor requested by MK. MK and Mr. Kercheval supervised the work at the site and directed the workers." CP at 33.
Common sense also supports the notion that BFS did not supervise the laborers' actual construction work. MK was a concrete specialist, and BFS was a temporary employment agency that supplied employees for "every imaginable trade in construction." 1 RP at 48. It seems unlikely that any BFS official would supervise the actual concrete work in light of MK's evident knowledge and skill.
BFS correctly notes that a supervisory role may confer subcontractor status. See Farwest, 48 Wash.App. at 726, 741 P.2d 58. But supervision in the abstract will not do; it must relate to the project's actual construction. Here, the trial court's findings, trial testimony, and common sense make clear that any supervision by BFS was qualitatively different than that required to confer subcontractor status. The only supervision sufficient to confer subcontractor status here was that done by MK and Kercheval. Thus, Bill McMahan's supervision does not render BFS a subcontractor.
BFS next maintains that "A BFS employee, Mike Kercheval, supervised all of the work performed by BFS employees at the site and directed the workers." Br. of Resp't at 19. BFS wants to establish this employment *430 relationship so that we will attribute Kercheval's supervision to BFS in determining whether BFS was a subcontractor.
As Caicos argues, the claim to Kercheval's supervision overstates the trial court's findings. The only finding that addresses an employment relationship between BFS and Kercheval states that, "on a prior project ... Mr. Kercheval had been an employee of BFS." CP at 31 (emphasis added). The trial court made no specific finding on Kercheval's present employment, finding only that "MK's principal was Mike Kercheval." CP at 31. Although Kercheval could have been both principal of MK and employee of BFS, the parties have neither argued that point nor addressed the law on Kercheval's status. Therefore, we do not accept the claim that Kercheval was BFS's employee, thereby entitling BFS to his supervision.
Even if Kercheval was, technically, a BFS employee, the scope of that employment relationship would be defined by the various actions and responsibilities that BFS bore on his behalf. BFS's actions and responsibilities were merely administrative, bearing no nexus with the project's physical labor and construction. Kercheval clearly supervised the concrete work in his capacity as the principal of MK, not in his pro forma capacity as a BFS employee. Therefore, even if Kercheval was a BFS employee, BFS's actions still lack the necessary nexus with the project's construction to support a subcontractor designation.
BFS next identifies its various administrative duties on behalf of the supplied laborers as evidence that it was a subcontractor. The trial court's findings indicate that BFS maintained employment records; paid industrial insurance premiums and unemployment insurance; filed returns for the laborers with the Department of Labor and Industries and the state Employment Security Department; withheld amounts for federal tax, Medicare and FICA purposes; paid the employer's share of federal tax obligations; entered into employment contracts with the supplied laborers; and submitted certified payroll records to MK and Caicos to ensure its payment of prevailing wages.
Though these points do illustrate that BFS performed administrative work on each laborer's behalf, they simply do not show that BFS undertook a specific portion of the labor or performed any work on site. BFS's task, indeed the reason for its business existence, was merely to provide laborers. Any connection that BFS did have with the project was qualitatively different than that required for subcontractor status. We reject BFS's claim that it was a subcontractor on the project and hold that BFS is not within the protected class of RCW 39.08.010 or RCW 60.28.011. The trial court therefore erred in concluding that BFS was a proper claimant under the statutes.

II. Joint Check Theory
BFS next claims that the trial court should be affirmed on a breach of contract theory. The argument is as follows: Caicos agreed to issue joint checks to BFS and MK; because BFS did not receive any funds under the second joint check, which MK deposited without BFS's endorsement, Caicos is liable to BFS for breach.
BFS did not argue its breach of contract theory to the trial court.[5] "We will not consider issues raised for the first time on appeal." Bradbury v. Aetna Cas. & Sur. Co., 91 Wash.2d 504, 512, 589 P.2d 785 (1979). Therefore, we decline review of the issue.

III. Attorney Fees
Caicos requests attorney fees under RCW 39.08.030 and RCW 60.28.030. RCW 39.08.030 states, in part, "in any suit or action brought against [the bond's surety] ... the claimant shall be entitled to recover ... attorney's fees." (Emphasis added). RCW *431 60.28.030 states, in part, "[i]n any action brought to enforce the lien, the claimant, if he prevails, is entitled to recover ... attorney fees." (Emphasis added). Neither statute provides for an award of fees to the defendant in an action against the contractor's bond or on the retainage lien. Therefore, Caicos's request for attorney fees is denied.
Reversed.
We concur: HOUGHTON, P.J., and ARMSTRONG, J.
NOTES
[1] It is unclear what text BFS is citing here. RCW 39.08.030, governing actions on the bond, contains a similar phrase "person claiming to have supplied materials"but the phrase clearly does not apply to persons claiming to have "furnished labor." This is the only similar phrase in chapter 39.08 RCW.
[2] Division One declined to address the subcontractor theory in Transtech because BFS had not argued the theory to the trial court.
[3] BFS claims that the on-site work requirement fully disposes of the "subcontractor" question under Farwest. Br. of Resp't at 17. This is not entirely accurate. While the court did state that the on-site work requirement is "[a]nother common test," it actually employed both tests in its analysis, implying that all three factors inform the subcontractor issue. Farwest, 48 Wash.App. at 726, 741 P.2d 58. The court stated "[c]ourts applying the substantial relationship test also may consider the presence or absence of on-site work to be a significant factor." Farwest, 48 Wash.App. at 726, 741 P.2d 58. We consider all three factors.
[4] Michael McMahan was BFS's general manager.
[5] Although BFS asserted a cause of action for breach of contract, the claim was different: MK allegedly assigned to BFS its rights under its subcontract with Caicos. BFS's breach of contract claim sought recovery under this contract.